**IN THE UNITED STATES DISTRICT COURT**
**FOR WESTERN DISTRICT OF THE**
**SAN ANTONIO DIVISION**

| | | |
|---|---|---|
| **MARLO ONDREJ, Individually as** | § | |
| **surviving mother of HANNAH** | § | |
| **QUINN WESTALL and as the** | § | |
| **representative of THE ESTATE** | § | |
| **OF HANNAH WESTALL, and the** | § | |
| **Statutory Beneficiary J. B. M.,** | § | |
| | § | |
| **v.** | § | **CIVIL ACTION NO. 5:21-cv-281** |
| | § | |
| **THE CITY OF SAN ANTONIO,** | § | |
| **TEXAS, AND DAVID PERRY.** | § | |

**PLAINTIFFS' ORIGINAL COMPLAINT**

TO THE HONORABLE JUDGE OF SAID COURT:

Plaintiffs MARLO ONDREJ ("ONDREJ") individually as the surviving mother of

HANNAH WESTALL, and the representative of the Estate of HANNAH QUINN WESTALL

(hereinafter "WESTALL"), and the Statutory Beneficiary minor J.B.M., the surviving daughter

of HANNAH QUINN WESTALL (Collectively "the Plaintiffs") file this Complaint and for

cause of action will show the following:

**INTRODUCTION**

1.       The Plaintiffs bring this cause of action against the City of San Antonio, Texas, and

San Antonio Police Sergeant David Perry ("Sgt. Perry") for Sgt. Perry's excessive use of force

that caused the death of 26-year-old HANNAH QUINN WESTALL under color of law in

violation of her rights under the Fourth, Eighth, and Fourteenth Amendments of the U.S.

Constitution and in violation of her civil rights pursuant to 42 U.S.C. § 1983. Plaintiffs

ONDREJ and WESTALL'S minor daughter J.B.M. are seeking and are entitled to recover

damages arising from WESTALL'S wrongful death as applied under 42 U.S.C. § 1983 as well

as all other applicable laws the Defendants' violated as more fully detailed herein.

2.      Here, the CITY OF SAN ANTONIO and its Policymakers, Chief of Police William

McManus ("McManus"), City Manager Erik Walsh ("Walsh"), the San Antonio City Council,

and Mayor Ron Nirenberg ("Nirenberg") (Collectively "the Policymakers" or "the City")

failed to implement proper policies and procedures regarding the proper use of force both in

general and most importantly with respect to the use of force against individuals who suffer

from or appear to be suffering from mental health issues. Further, McManus and the other

Policymakers also wholly failed to properly train San Antonio Police ("SAPD") Officers like

Sgt. Perry as to the proper manner to respond to mental health calls that involve the alleged

possession of a weapon. The Policymaker's total failure to train SAPD Officers led to a

practice that has resulted in numerous constitutional violations in the form of wrongful deaths

of individuals who had contact with SAPD Officers and were killed because the officers lacked

the proper training to evaluate the situation and avoid the use of deadly force. On or about

September 11, 2020, the Policymakers publicly admitted that it had failed to properly train its

officers and to implement proper procedures for responding to mental health calls when they

announced new procedures to avoid situations like the one that caused the tragic and

unnecessary death of HANNAH WESTALL. Sadly, the needed changes in training and policy

came too late because the failure of the Policymakers to implement a rational policy and to

properly train Sgt. Perry directly resulted in WESTALL being shot five times to death in

violation of Fourth, Eighth, and Fourteenth Amendments of the U.S. Constitution. Finally, the

unwritten policy and custom of Chief McManus and the City Policymakers to make false

statements regarding the constitutional violations of SAPD officers and then to conspire

together to conceal the video evidence of the violations is also a cause of the violation of WESTALL'S clearly established constitutional rights.

## **PARTIES**

3.     Plaintiff MARLO ONDREJ is a U.S. citizen and a resident of Bexar County, Texas. ONDREJ is the surviving mother of HANNAH WESTALL. ONDREJ is also the representative of the Estate of HANNAH WESTALL. ONDREJ brings this cause of action in all her enumerated capacities for the wrongful death of her daughter under 42 U.S.C. § 1983 and all other applicable laws.

4.     Plaintiff J.B.M. is a U.S. citizen who is the minor daughter of HANNAH WESTALL. J.B.M. is acting through MARLO ONDREJ who is her legal guardian and with whom she resides. J.B.M. brings this cause of action for the wrongful death of her mother under 42 U.S.C. § 1983 and all other applicable laws.

5.     Defendant CITY OF SAN ANTONIO ("City") is a Texas municipality. The City funds and operates SAPD, and City Manager Walsh serves as the City's Chief Administrator. The City Manager is responsible for carrying out all City policies and overseeing the day-to-day operation of the municipality. City Council members also rely on Walsh to provide professional advice before the body acts on a particular issue. City Manager Walsh along with Chief of Police McManus and Mayor Nirenberg were at all relevant times responsible for the implementation of SAPD'S budget, policies, procedures, practices, and customs, as well as the acts and blatant omissions that are the subject of this suit. The City of San Antonio Police is also responsible for preventive, investigative, enforcement services and assuring the safety of all its citizens. The City of San Antonio can be served by serving its registered agent Andrew Segovia at the Office of the City Attorney, 203 South St. Mary's Street, 2nd Floor, San Antonio, TX 78205 or wherever

he may be found. Additional service is being made on Mayor Ron Nirenberg, 115 Plaza De

Armas, 2ⁿᵈ Floor, San Antonio, TX 78205 and Chief of Police, William McManus, 315 South

Santa Rosa Ave, San Antonio, TX 78207.

6.     Defendant David Perry is a resident of San Antonio, Bexar County, Texas, and at all

times relevant to this cause of action was a Sergeant with the CITY OF SAN ANTONIO.

Service is being made on Sgt. Perry at 5020 Prue Road (SAPD Substation), San Antonio, TX

78240 or wherever he may be found.

## JURISDICTION

7.     The Court has jurisdiction over this cause of action pursuant to 28 U.S.C. §§ 1331 and

1343 because the action is brought to redress the deprivation of the rights, privileges and

immunities guaranteed to WESTALL by the Fourth, Eighth, and Fourteenth Amendments of the

U.S. Constitution and 42 U.S.C. § 1983.

## FACTS

**A. Objective Facts Taken from Dashcam Videos and portions of the Statement of
Sgt. Perry establish that WESTALL was the victim of Violations of her Clearly
Established Constitutional Rights.**

8.     On March 20, 2019 at 5:18 p.m., HANNAH WESTALL was walking in the parking lot

of the Huebner Commons shopping center that is located at the intersection Vance Jackson and

Huebner in San Antonio, Texas. WESTALL was wearing a crop top T-shirt and baggy

sweatpants. WESTALL was in possession of a toy replica of a firearm that was tucked in the

back of the waistband of her baggy sweatpants when she was approached by Sgt. David Perry of

the San Antonio Police Department who shot her five times to death within seconds of their

encounter. Most of the facts of that encounter are not in dispute because it was recorded by Sgt.

Perry's police dashcam and in part by the dashcam on the vehicle of man who happened to be

leaving the shopping center at the time of the fatal shooting. Also, on March 20, 2019 at 9:50

p.m., Sgt. Perry who at the time of this shooting was a 23-year veteran of the San Antonio Police

Department gave a sworn statement to a SAPD detective regarding his fatal shooting of

WESTALL. Sgt. Perry's statement is only eight paragraphs long and the first six paragraphs of

his brief statement describe his actual encounter with WESTALL. The first three paragraphs of

his statement appear to be credible and do confirm much of what is revealed by the video

evidence. Most of the balance of his statement is either contradicted by the objective video

evidence or completely incredible.

9.       On March 20, 2019 at 5:17 p.m., Sgt. Perry had just completed a visit to a donut shop in

the Huebner Commons shopping center when he heard a police radio call for a female walking

down the street at the intersection of Huebner and Vance Jackson with a gun in her waistband.

The actual 911 call that led to the police radio call was a report by a female caller who stated that

she had seen WESTALL at a corner store in the area and that WESTALL appeared to be

"**distraught.**" The 911 caller did not state that WESTALL had threatened anyone with any

weapon, nor did she provide facts that would tend to show that some danger was imminent. The

911 caller clearly and concisely stated that she had seen WESTALL walking on Huebner with

what looked like an "Uzi" in her waistband, and she suggested to the dispatcher that she should

"**get a cop over here (i.e., to the shopping center), at least check her out, see if it's safe.**

**Hopefully, it's safe**." The 911 caller offered facts of a situation that suggested that WESTALL

potentially had some mental health issues but did not appear to pose any imminent threat of harm

to anyone.

10.      Sgt. Perry assigned himself to the call and at 5:17:45 p.m. he began to back out of the

parking space near the donut shop he had just visited, and he began to drive through the parking

lot of the shopping center. Seventeen (17) seconds later, at 5:18:22 p.m., the police dashcam first shows WESTALL walking a good distance in front of Sgt. Perry's vehicle. In his sworn statement, Sgt. Perry described WESTALL as "extremely skinny," wearing "white saggy pants, pink tube top and dirty blonde hair which was unkept." Sgt. Perry's also admits to quickly closing the distance between he and WESTALL and his dashcam video confirms that he in fact drove in her direction and quickly confronted her. Both the police dashcam and the dashcam of the passerby reveal that Sgt. Perry's vehicle came to a complete stop just feet in front of WESTALL at 5:18:37 p.m. The police dashcam shows WESTALL walking in the parking lot while vaping and not posing any immediate threat of harm to Sgt. Perry or anyone in the area. WESTALL stopped walking apparently on the command of Sgt. Perry who admits to immediately shouting commands to WESTALL. However, the dashcam has no audio because Sgt. Perry failed to activate the dashcam on his vehicle. Sgt. Perry also failed to activate his body worn camera (body cam) in violation of the requirements of Texas Occupations Code § 1701.657 and SAPD General Manual Procedure 410.06E which states that "Officers should begin recording upon the reception of or response to CFS (i.e., calls for service) whether dispatched or not…However, officers **shall** begin recording prior to arriving at the scene" (emphasis added).

11.    Per Sgt. Perry's instructions, WESTALL is seen in the video raising her arms and slowly turning her body to her right so that Sgt. Perry could see the toy replica firearm that she had in the back of her waistband. The resolution of the dashcam video is poor but it is undeniably clear that beginning at 5:18:45 p.m., WESTALL began to specifically state to Sgt. Perry as follows: "**It's a toy**. **It's not real**." At 5:18:50 p.m., WESTALL slowly begins to lower her hands and reach for her toy with her right hand. The dashcam video clearly reveals that WESTALL never removed her toy from her waistband during the encounter much less did she point the toy at Sgt.

Perry or anyone else in the shopping center. Immediately after WESTALL disclosed to Sgt. Perry that she was in possession of a toy, the police dashcam shows WESTALL'S facial expression and body language suddenly change from one of calm to one of panic and she then screams, "**WAIT**!"  Both the police dashcam and the dashcam on the vehicle driven by the witness reveal that the time was 5:18:51 p.m. when Sgt. Perry fired <u>five</u> .40 caliber rounds and killed WESTALL. The facts reveal that a mere 14 seconds elapsed from the time Sgt. Perry stopped his vehicle in front of WESTALL to the time he opened fire on her. Sgt. Perry rushed in on WESTALL as if she were an active shooter or someone who posed some imminent threat of serious bodily injury to him or others instead of a 5'-2" 95-pound young lady walking in a parking lot armed with nothing but a vaping device and a toy firearm in her waistband.

12.     The Bexar County Medical Examiner's Autopsy Report of WESTALL'S death found that she suffered seven (7) gunshot wounds from the five .40 caliber shots. The Medical Examiner determined that WESTALL sustained the following injuries from the first three gunshots fired: 1) a gunshot entered WESTALL'S lower abdomen, and that same projectile caused a separate wound to her lower left leg; 2) a second gunshot entered her lower left leg (this projectile was recovered); 3) and a third shot entered her right-hand causing wounds to the 4th and 5th fingers of her right hand. There is no plausible basis for Sgt. Perry to have objectively perceived an imminent threat from WESTALL as she walked through a parking lot vaping but assuming Sgt. Perry had some irrational perception of danger that fear should have been allayed after he fired the first three shots that caused WESTALL to fall helplessly to the ground and that also caused her toy to fall from her sweatpants to the ground. The first three shots caused five serious wounds but not necessarily fatal wounds. However, Sgt. Perry fired two more rounds striking WESTALL in the back of her head. The Autopsy Report described the first head wound

as impacting the "posterior medial right side" of WESTALL'S head, but that wound was found to have only grazed the back of WESTALL'S "scalp," thereby causing "no obvious internal injuries." The Autopsy Report describes the fatal gunshot as entering the "posterior left side" of WESTALL'S head, "Injures" her "brain," and "fractures" her "skull" causing "intracranial hemorrhages" (i.e., acute bleeding inside her brain/skull). The Medical Examiner did recover the projectile from this fatal gunshot wound from WESTALL'S head.

13.     There is no objectively reasonable basis for Sgt. Perry to have fired a single shot within seconds after WESTALL raised her arms and informed him that she was in possession of a toy. However, it was inherently excessive for Sgt. Perry to continue to shoot WESTALL after he fired the first three shots that caused WESTALL to fall helplessly to the ground. It is indisputable that the final two shots including the fatal shot were fired when WESTALL was on the ground with her head down because Sgt. Perry was in front of WESTALL throughout their brief encounter thereby making it impossible for her to suffer posterior head wounds before she helplessly fell to the ground. The fatal gunshot was so severe that it created an entry wound in the back of WESTALL'S head that the Medical Examiner found to be one centimeter in diameter. Sgt. Perry's objectively unreasonable decision to fire five rounds was unconstitutionally excessive and occurred as a direct result of a constitutionally flawed use of deadly force policy and the complete lack of any training or procedures regarding police encounters with mentally ill persons.

**B. The Failure of Policymakers to Train Officers to Respond to Mental Health Calls Caused Sgt. Perry to Violate Westall's Clearly Established Constitutional Rights.**

14.     WESTALL was shot five times to death as the direct result of the failure of Chief McManus and the other City Policymakers to recognize the longstanding need to train SAPD

officers to properly respond to calls regarding persons experiencing a mental health issue. The Policymakers did not even draft procedures to address mental health 911 calls until August 24, 2020 and those policies did not go into effect until December 21, 2020. It is widely known and understood that law enforcement agencies are increasingly responding to 911 calls that involve persons suspected to be suffering some mental health issue or crisis. Indeed, the National Alliance on Mental Illness ("NAMI") has reported that 20.6% of Americans experienced mental illness in 2019 which represents 1 in 5 of all Americans. NAMI has also discovered and reported that one in four people shot and killed by police officers between 2015 and 2020 had a mental condition. Given these incontrovertible facts, it is almost incomprehensible for the City Policymakers to have failed to implement procedures or protocols to instruct SAPD officers on the best course of action when responding to mental health calls until just three months before the filing of the instant lawsuit.

15.     These new procedures were announced at the San Antonio City Council Meeting that was held on September 11, 2020. The official minutes of that meeting reveal that "Chief McManus reported that an Escalated Mental Health Crisis Call Protocol was put in place last week and applied to calls where weapons were involved… He indicated that **the main objective was to limit the likelihood that the encounter would escalate further and to provide a peaceful resolution to the call**." (emphasis added). In interviews with the press, Chief McManus stated: "**We want to create some time or some distance before we have to confront that person**." **and evaluate what other resources we may need at the scene to prevent anyone from getting hurt**.[1]" In a SAPD press release that has since been deleted from the City website, Chief

---

[1] https://www.expressnews.com/news/local/politics/article/New-rules-for-officers-on-mental-health-calls-15561018.php; and https://www.ksat.com/news/local/2020/09/11/sapd-changes-policies-on-mental-health-calls-prohibits-use-of-no-knock-warrants/

McManus was quoted as follows: "The newly established Escalated Mental Health Crisis Protocol's objective provides officers with a way to help an individual who is need of mental health assistance. **This new protocol aims to deescalate situations and equip officers with the tools needed in the field to protect lives**."

16.     These "newly established" mental health protocols were added to the SAPD General Manual at Procedure 611—Mentally Ill Persons. The protocols do require SAPD officers to take a commonsense approach when responding to calls for a person who appears to be distraught and possibly in possession of a weapon. For example, in the new SAPD Procedure 611.07 an officer who arrives at the scene of a possible mental health crisis is instructed to "**effectively evaluate the situation prior to taking any action**." The same procedure also provides that the responding officer "**should not approach the consumer unless the consumer initiates the contact or in the event of a life-threatening incident.**" These are rather simplistic rules that would have saved WESTALL'S life had Chief McManus and the City Policymakers not been deliberately indifferent to need for such rules and the research and recommendations by the acclaimed International Association of Police Chiefs ("IAPC") regarding the need to improve police response to persons affected by mental illness. On March 22, 2016, IACP convened an advisory group made up of both law enforcement experts and medical professionals to address police response to persons affected by mental illness.[2] The advisors' principal task was to discuss the problem in depth and create a set of recommendations to help law enforcement agencies effectively manage their officers' response to persons affected by mental illness. That symposium led to the creation of a Model Policy for Responding to Persons Experiencing a

---

[2]  https://www.theiacp.org/sites/default/files/2018-08/ImprovingPoliceResponsetoPersonswithMentalIllnessSymposiumReport.pdf

Mental Health Crisis that was available to Chief McManus and all City Policymakers to implement well before Sgt. Perry rushed up on WESTALL and shot her five times to death.

17.    The IACP Model Policy was last updated in 2018 and, in sum, it requires much of what has been proposed by SAPD, but it includes much greater specificity so that officers understand exactly how to assess the risks and avoid exacerbating an encounter with someone who may be affected by mental illness.[3] The chart below provides a summary of the fatal errors that Sgt. Perry committed because he lacked the proper training to respond to a call for a distraught woman who was perceived by some to be in possession of an actual firearm.

| Illegal Response by Sgt. Perry | Proper Response Per IACP Policy |
|---|---|
| <ul><li>Rushed In</li><li>Quickly Closed Space</li><li>Immediately Engaged Westall</li><li>Shouted Commands</li><li>Escalated Situation and</li><li>Without Even Being Threatened He Chose to Use Deadly Force</li></ul> | <ul><li>Call for Experienced Back up</li><li>Give the Subject Room but Isolate Her</li><li>Disengage</li><li>Speak Calmly, Develop Rapport</li><li>De-Escalate Situation</li><li>Wait for Person to Calm Down (Not Needed Here)</li><li>Use Less Than Deadly Force</li></ul> |

The failure by Chief McManus and the City Policymakers to implement mental health protocols caused WESTALL'S death but it is not the only cause of the inability of SAPD officers to avoid using unconstitutional and unnecessary deadly force.

### C. SAPD Use of Force Procedures were Constitutionally Deficient and Caused Sgt. Perry to Violate Westall's Clearly Established Constitutional Rights.

18.    From January 31, 2017 to July 6, 2020, the City Policymakers employed a Use of Force policy that was found in the SAPD General Manual at Procedure 501—Use of Force. The policy permitted SAPD officers like Sgt. Perry to use deadly force on a suspect whenever the officer

---

[3]  MentalIllnessPolicy2018.pdf (theiacp.org)

had an "honest and sincere personal belief that his life" may be in "imminent danger." This policy offered absolutely no instruction as to what circumstances might constitute an "objectively reasonable" basis for using deadly force nor did it instruct SAPD officers like Sgt. Perry on ways to avoid the need for the use of deadly force. In fact, the word "avoid" is not found in the former SAPD Procedure 501. This policy is constitutionally deficient because it trains SAPD officers to believe it is permissible to fire five shots including two shots to the back of the head of helpless persons like WESTALL, so long as the officer firing those shots to the back of a 95-pound woman's head had a "sincere personal belief" that such shots were necessary. This policy did not consider the obvious objective unreasonableness of such dreadful conduct, and the need for officers to avoid such conduct so as not to violate clearly established constitutional rights and cause unnecessary and tragic deaths.

19.     On July 6, 2020, one year and four months after WESTALL was killed, Chief McManus and the City Policymakers finally included at least a modicum of protection for San Antonio residents from the use of deadly force by SAPD officers when it added a new policy provision to Procedure 501 entitled: "**Avoiding the Use of Deadly Force**." This new provision now requires SAPD officers to employ "reasonable alternatives" to deadly force as soon as the officer does or "should reasonably perceive the potential exists that deadly force may be an outcome of any situation." "**The reasonableness of the action is based upon the time available, the opportunity of performing the action, and the facts apparent to the officer prior to and during the incident**." WESTALL would be alive today had Sgt. Perry acted reasonably based on the facts apparent to him such as the fact that WESTALL was doing nothing more than walking and vaping and not posing any imminent threat if harm to anyone that would have necessitated the need to shoot her five times within 14 seconds of his initial encounter. The

dashcam video shows that Sgt. Perry could have driven past and parked behind WESTALL as she innocently walked and vaped. He then could have just monitored her and called for an officer competent to deal with a potential mental health crisis. The lack of any imminent threat gave Sgt. Perry ample time to make some commonsense assessments such as recognizing that the waistband of WESTALL's "white saggy pants" could not support any firearm much less a firearm as large as an Uzi. Further, Sgt. Perry could have exited his vehicle, activated his body cam and calmly spoken to WESTALL about what she was doing and if she was in possession of a real firearm. Sgt. Perry failed to employ any de-escalation method in the model policy because he had not been trained on the need to employ the now mandatory "reasonable alternatives." Had Sgt. Perry been properly trained he would not have violated WESTALL'S Fourth, Eighth, and Fourteenth Amendment rights. Sgt. Perry also would not have made false statements about his civil rights violation if Chief McManus and the City Policymakers did not engage in an unwritten policy and practice of making false statements and banding together to conceal constitutional violations.

**D. Sgt. Perry made false claims under oath about the shooting.**

20.    Beginning in the fourth paragraph of his sworn statement, Sgt. Perry begins to make claims about the fatal shooting that are contradicted by the objective video evidence. First, Sgt. Perry stated that WESTALL "quickly put her hands up and then quickly put them back down." That allegation is contradicted by his own dashcam that reveals that she raised her hands slowly and kept them up as she turned to her right side while at the same time explaining to Sgt. Perry that what she was in possession of was a toy. Sgt. Perry added that WESTALL'S movements were "very pronounced and deliberate" and that her "demeanor did not appear that she was giving up." Those statements are also contradicted by the video evidence because WESTALL'S

demeanor is one of calm and it is undeniable that she attempted to surrender her toy and even made a desperate plea for Sgt. Perry to "Wait" before he fired on her five times.

21.     In the fifth paragraph of his sworn statement, Sgt. Perry made the most outrageous of his false allegations when he stated that he saw WESTALL "put one of her hands behind her back and [she] **pulled the firearm from her waistband. I saw the firearm and her demeanor, and it appeared as if she was going to shoot me**." That allegation is nothing short of perjurious because the same video evidence shows that WESTALL never took her toy out of her waistband such that Sgt. Perry could see it, nor did her "demeanor" suggest that she was about to shoot him with a toy. On the contrary, the toy did fall to the ground as she was being shot to death but the objective proof reveals that she disclosed it was a toy and begged him not to fire upon her. Sgt. Perry also stated under oath that he "does not remember her [WESTALL] saying anything during the encounter." Again, Sgt. Perry's own dashcam clearly shows that just a few seconds before he took her life, she said to him: "**It's a toy**. **It's not real**. **WAIT**!" Sgt. Perry's willingness to make false claims and conveniently suffer from a lapse of memory is contemptable in and of itself but it becomes even more disturbing when you consider the fact that he did not properly activated his dashcam nor did he activate his body cam as required by law and departmental policy. Sgt. Perry would not be able to make such false claims had he activated his body worn camera in accordance with the law.

### E. Chief McManus and the City have a policy of making false statements about fatal shootings to conceal constitutional violations.

22.     Chief McManus joined Sgt. Perry in making false statements about the fact of the fatal shooting of WESTALL beginning with his first interview with the San Antonio press at the scene of the shooting wherein he falsely stated twice that WESTALL pointed her toy firearm at

Sgt. Perry. Specifically, McManus stated that "She [WESTALL] very slowly turned around,

**pulled the gun and pointed it at the Sergeant**, and he shot multiple times…" Later in the same

interview, McManus reiterated that "We [SAPD] received a call for a woman with a gun tucked

in the back of her sweatpants. Sergeant was already on the scene [on duty at a donut shop] and he

confronted her gave her a command and she drew the weapon and the Sergeant fired and struck

her multiple times and she is deceased in the parking lot." Chief McManus did confirm that the

911 caller had opined that WESTALL was acting "distraught" but he chose to maintain the

falsehood that WESTALL pointed a real firearm at Sgt. Perry when on March 29, 2019, he

approved the following statement in the Custodial Death Report that all Texas law enforcement

agencies are required to make to the Texas Attorney General's Office ("AG") whenever there is

a police involved shooting:

> "Suspicious/ Erratic Female in a parking lot carrying an Uzi style firearm. Confronted by
> Police Officer and refused to follow commands and displayed firearm. **Decedent pulled
> firearm from waistband and pointed firearm at officer who discharged his duty
> weapon**."

23.     The report the Chief McManus made to the AG wherein he reiterated the false claim that

WESTALL pointed a firearm at Sgt. Perry did make the shooting appear to be not only justified

but necessary. By making such a demonstrably false claim, Chief McManus not only mislead the

public and all of WESTALL'S family, but he also committed a Class B misdemeanor under

Texas law. The Texas Code of Criminal Procedure Art. 49.18 requires McManus to "investigate

the death and file a written report of the cause of death with the attorney general no later than the

30th day after the date on which the person in custody or the incarcerated person died. The

Director (i.e., Chief McManus) **shall make a good faith effort to obtain all facts relevant to

the death and include those fact in the report**." Texas Penal Code Section 39.05 provides that

"A person commits an offense if the person is required to conduct an investigation and file a

report by Article 49.18, Code of Criminal Procedure, and the person fails to investigate the death, fails to file the report as required, **or fails to include in a filed report facts known or discovered in the investigation**. Here, Chief McManus can claim that he simply did not have the opportunity to review the evidence when he made the false claim that WESTALL drew her toy firearm in his interview with the press shortly after the shooting. However, the only logical explanation for his blatant violation of Texas law in a report he made to the AG <u>nine</u> days after the tragic shooting is that he wished to conceal from the public the fact that Sgt. Perry's shooting of WESTALL was the result a deficient policy regarding the use of deadly force and its complete lack of training officers to properly respond to mental health calls.

24.      From March 20, 2019 (the date of the shooting) to August 13, 2020, Chief McManus and City of San Antonio Policymakers conspired together to enforce the City policy of concealing video evidence while at the same standing by a false narrative regarding Sgt. Perry's fatal shooting of WESTALL. For almost 11 months following WESTALL'S death her mother, Plaintiff MARLO ONDREJ, sought answers from SAPD regarding the tragic incident and she was told first by Chief McManus, then by SAPD Homicide detectives and finally by SAPD Internal Affairs that her daughter had refused commands and pointed a firearm at Sgt. Perry thereby causing him to have to shoot her five times to death. ONDREJ also made numerous open records requests which were objected to by the San Antonio City Attorney's Office as part of the City of San Antonio policy to refuse to allow the families of fatal shootings and the public to know the facts of fatal shootings including whether the actions of the SAPD officer involved were justified from a civil rights perspective. On September 23, 2019, ONDREJ made one of her several open records requests to recover information regarding her daughter's death and the City

Attorney's Office made its customary objection and request for a ruling from the Texas AG on October 8, 2019.

25.     In a letter dated December 17, 2019 regarding ONDREJ'S September 2019 request, the Texas AG's office ruled that the City had failed to make a timely objection and that it had also failed to establish a compelling reason to overcome the presumption of openness in compliance with the relevant provisions of the Texas Government Code. Accordingly, the City was compelled to produce all relevant information except for body cam footage which the AG determined had not been properly requested. Of course, in this case any request for body cam footage is moot given Sgt. Perry's failure to activate his body worn camera in compliance with Texas law. The City Attorney refused to comply with the AG ruling and release all requested information choosing instead to adhere to the Policymaker's practice of concealing evidence of fatal shootings by SAPD officers. The City defied the AG's ruling to release information in compliance with the AG's ruling until February 17, 2020. ONDREJ had to wait almost a year to receive information on how her daughter was killed and that release only occurred three days after counsel for ONDREJ directly informed City Attorney Andy Segovia via email that the records had not been released in compliance with the AG's ruling and that a criminal complaint may be necessary to bring about City's compliance with the AG ruling and the applicable law.

26.     The February 2020 release of the dashcam video and other evidence that established that WESTALL did not refuse all commands and point a firearm at Sgt. Perry did not deter Chief McManus from maintaining his false statements about the WESTALL shooting in the Custodial Death Report. The City maintained its false narrative until a San Antonio's KSAT news aired and published a story that made it a matter of public knowledge that WESTALL did not place Sgt. Perry in a position wherein he had no choice but to fire five rounds within seconds of his

contact with her as represented by Chief McManus.[4] On August 13, 2020, just a few days after the KSAT report and seventeen months after the initial false Custodial Death Report, Chief McManus finally amended the Custodial Death Report to more accurately reflect what actually occurred. The amended report removes the false statement that WESTALL pointed her toy at Sgt. Perry and now reads as follows:

> "Suspicious/ Erratic Female in a parking lot carrying an Uzi style firearm. Confronted by Police Officer and displayed firearm in waistband. Decedent refused to follow commands and **reached for firearm from waistband at which time officer discharged his duty weapon**."

Chief McManus and the City Policymakers were willing to maintain the falsehood and conceal the facts until it became impossible to do so as has been the practice of the City in this and other cases.

27.    That same KSAT report detailed two other incidents involving the October 17, 2018 shooting of Charles Roundtree and the January 13, 2020 shooting of Randall Goodale wherein Chief McManus followed his policy of making false statements that made his officers conduct appear reasonable but that are also false and were ultimately contradicted by the video evidence. Sadly, after the deadly shooting by an SAPD officer of Darrell Zemault on September 15, 2020, Chief McManus and City Policymakers continued the practice of concealing video evidence and making false statements to conceal the actions of a poorly trained officer.[5]  In each of those cases, the City withheld video evidence of the fatal shootings after Chief McManus made numerous false representations regarding the conduct of his poorly trained officers. The

---

[4]  https://ksat.com//news/local/2020/08/10/dashcam-video-contradicts-sapds-narrative-that-woman-pointed-weapon-at-sergeant-prior-to-being-fatally-shot/
[5]  https://www.expressnews.com//news/local/article/Family-of-Black-man-killed-by-police-receives-15929074.php

willingness of Chief McManus, the City Attorney and City Policymakers to conceal facts regarding civil rights violations only leads to more such violations and more unnecessary deaths.

### F. Officer Involved Shootings have occurred at an alarming rate.

28.      WESTALL was killed by Sgt. Perry on March 20, 2019 but even by that early date she was the sixth person to be shot in an SAPD involved shooting that year. By the end of 2019, the number of SAPD involved shootings rose to 18. The number of shootings in 2019 constituted significant increase from 2018 when SAPD recorded 11 officer involved shootings, 12 were reported by SAPD in 2017 and 13 in 2016. In January 2020, Chief McManus was asked about the increase in the number of SAPD involved shootings and he stated: "There's all kinds of situations that arise that place officers in danger," McManus said. "**We're relying on that training to deal with that danger, but oftentimes the officer is left with no other alternative but to use deadly force**."[6] Chief McManus is correct that officers must rely on their training to avoid the unnecessary use of force but he and the City Policymakers utilized policies that allowed officers to shoot whenever they had a "personal belief" it was warranted without any instruction on what may constitute an objectively reasonable basis for using deadly force. The lack of any policy at all on how SAPD officers are to respond to mental health calls only contributed to more deaths in violation of the constitutional rights of local citizens. The number of SAPD involved shootings increased in 2020 with SAPD reporting nine fatal shootings of a suspect/person.[7] The number of shootings confirm that the City Policymakers failed to properly train SAPD officers like Sgt. Perry.

---

[6]  https://www.kens5.com//article/news/local/public-safety/san-antonio-police-see-50-increase-in-officer-involved-shootings-in-2019/273-0a730875-60e3-4a25-9c49-f52e08e1f445

[7]  https://www.ksat.com/news/local/2020/09/23/law-enforcement-officers-in-bexar-county-have-shot-killed-more-people-in-2020-than-2019-records-show/

## CAUSES OF ACTION

### A.  Sgt. Perry is liable under 42 U.S.C. § 1983 for violating Westall's Fourth Amendment Rights.

29.     The Plaintiffs incorporate by reference all the above paragraphs of this Complaint as though fully set forth herein.

30.     A shooting is a seizure, and the use of deadly force violates the Fourth Amendment unless the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others. *Tennessee v. Garner*, 471 U.S. 1, 11, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985)). A claim of excessive force is governed by an objective reasonableness standard under the Fourth Amendment. *Graham v. Connor*, 490 U.S. 386, 397, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). Excessive force claims are "necessarily fact-intensive; whether the force used is 'excessive' or 'unreasonable' depends on 'the facts and circumstances of each particular case.' " *Deville v. Marcantel*, 567 F.3d 156, 167 (5th Cir. 2009) (quoting *Graham v. Connor*, 490 U.S. 386, 396, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989)). *Darden v. City of Fort Worth,* 880 F.3d 722. 729 (5th Cir. 2018). "In making this determination [i.e., the objective reasonableness determination], a court should consider the totality of the circumstances, "including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396, 109 S.Ct. 1865." *Darden,* 880 F.3d 722. 729-730.

31.     Here, it is indisputable that WESTALL moved slowly as she disclosed to Sgt. Perry that her toy was in fact a toy and that just before he opened fire on her she screamed, "**WAIT**!" Those facts alone constitute an objective unreasonable use of force in violation of the Fourth Amendment. However, Sgt. Perry did not stop with that excessive use of force. Sgt. Perry

committed a subsequent constitutionally excessive use of force when continued to shoot WESTALL after he had fired three gunshots that caused WESTALL to fall helplessly to the ground. After WESTALL fell to the ground with her head down and the toy out of reach, Sgt. Perry fired two more rounds to the back of WESTALL'S head. One of the two gunshots to the back of WESTALL'S was fatal and left an entry wound in the back of WESTALL'S head that the Medical Examiner found to be one centimeter in diameter. Sgt. Perry's firing of the last two gunshots to the back of WESTALL'S head constitutes a blatant violation of WESTALL'S right to be free from unreasonable searches and seizures under the Fourth Amendment, it also violated her right to be free from cruel and unusual punishment under the Eighth Amendment, and her right not to be deprived of life, liberty, or property without due process of law, and to be accorded the equal protection of the laws as guaranteed under the Fourteenth Amendment. Sgt. Perry's conduct was so outrageous that it is greater than a civil rights violation. Tragically, Sgt. Perry's conduct was more akin to a public execution.

32.     The Plaintiffs have sustained injuries and losses and they are seeking to recover all damages to which they are entitled to recover as a result of Sgt. Perry's outrageous constitutional violations.

> **B.  The City of San Antonio is liable under 42 U.S.C. § 1983 for violating the Plaintiffs' Fourth Amendment Rights.**

33.     The Plaintiffs incorporate by reference all the above paragraphs of this Complaint as though fully set forth herein.

34.     The City of San Antonio is liable for all damages suffered by the Plaintiffs pursuant to *Monell v. Department of Social Services*, 436 U.S. 658 (1978) and 42 U.S.C. § 1983, based on its inadequate use of force policy, its deliberate indifference to the need for policies, training, and supervision of officers to properly respond to 911 mental health calls, and its practice of

concealing evidence of constitutional violations which causes officers like Sgt. Perry to commit further unconstitutional acts. The lack of any policy on mental health and a deficient policy on the use of force proximately caused Sgt. Perry to violate the clearly established constitutional rights of HANNAH WESTALL including her right to be free from excessive force and the unnecessary taking of her life.

35.     Chief McManus and City Policymakers are responsible for establishing and implementing policies and procedures so that its officers are properly trained to perform their duties in a manner that comports with and upholds the constitutional rights of its citizens. SAPD officers like all peace officers rely on their training which comes in the form of the policies and procedures that are implemented by the City Policymakers. Here, the Use of Force policies implemented by the Policymakers were constitutionally deficient because SAPD officers like Sgt. Perry were trained to believe that it is permissible to fire five shots including two shots to the back of the head of helpless persons like WESTALL, so long as the officer firing those shots to the back of a 95-pound woman's head had a "sincere personal belief" that such shots were necessary. The SAPD Use of Force policy was not based on the constitutional standard of objective reasonableness as provided in *Graham v. Connor*, 490 U.S. 386, 397, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989) ("'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene"—not based on the particular officer's subjective evaluations).

36.     Further, the SAPD Use of Force Policy failed to consider that the objective reasonableness determination is based on "the totality of the circumstances, "including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by

flight." *Graham*, 490 U.S. at 396, 109 S.Ct. 1865." *Darden,* 880 F.3d 722. 729-730. The SAPD

Use of Force Policy does not train its officers to recognize and appreciate that they are not

justified in using deadly force when a suspect poses no immediate threat to the officer or to

others. See, *Cole v. Carson*, 935 F.3d 444, 453 (5th Cir. Aug. 20, 2019) (reh'g en banc) (officers

not justified in using deadly force "[w]here the suspect poses no immediate threat to the officer

and no threat to others.") (emphasis added); Graham v. Connor, 490 U.S. 386, 396 (1989)

37.     In March 2019, the constitutionally deficient SAPD Use of Force policy was employed

by Sgt. Perry and all SAPD officers to all persons regardless of whether a person encountered by

an officer was suffering from a mental health issue. The complete failure of the City

Policymakers to implement a constitutional Use of Force policy and specific policies for

responding to mental health calls caused Sgt. Perry to believe that it was appropriate for him to

quickly confront WESTALL and fire five shots into her body and into the back of her head even

after she told him that she did not pose any risk of harm to him and after she begged him to wait

before he fired upon her. Sgt. Perry shot WESTALL to death because he was trained to shoot to

kill as long as he subjectively believed it was necessary and not because he was facing an

immediate threat of harm that an objectively reasonable officer would have recognized required

the use deadly force.

38.     The written policies were patently unconstitutional and the unwritten policy and custom

of Chief McManus and the City Policymakers to make false statements regarding the

constitutional violations of SAPD officers and then to conspire together to conceal the video

evidence of the violations is also a cause of the violation of WESTALL'S clearly established

constitutional rights. Sadly, WESTALL was not the only victim of this unwritten policy of the

City to lie and then conceal the truth. Chief McManus made false statements to conceal the

constitutional violations of an SAPD officer in the October 17, 2018 shooting of Charles Roundtree, the January 13, 2020 shooting of Randall Goodale, and the deadly shooting by an SAPD officer of Darrell Zemault on September 15, 2020.  WESTALL, Roundtree, Goodale and Zemault are the known victims of Chief McManus and the City Policymakers practice of making false statements and concealing video evidence of the constitutional violations of poorly trained SAPD officers. There are likely other victims of such conduct who did not have the wherewithal to raise awareness and seek the appropriate legal redress. The willingness of Chief McManus, the City Attorney and City Policymakers to conceal facts regarding civil rights violations was a moving force in the violations committed by Sgt. Perry.

39.     In sum, the CITY OF SAN ANTONIO and its Policymakers, Chief of Police William McManus, City Manager Erik Walsh, the San Antonio City Council, and Mayor Ron Nirenberg, acting through official policies, practices, and customs, and with deliberate, callous, and conscious indifference to the constitutional rights of WESTALL, failed to implement and/or enforce the policies, procedures; and practices necessary to provide constitutionally adequate protection and assistance to WESTALL. Instead, the City implemented policies, procedures, and practices that interfered with or prevented WESTALL from receiving the protection, assistance and care she deserved.

40.     For instance, the following conduct, policies, and customs, inter alia, by Defendants proximately caused the violation of WESTALL'S constitutional rights under the Fourth, Eighth, and Fourteenth Amendments to the U.S. Constitution:

> (a) The inadequacy of SAPD's policies, training, supervision, or discipline relating to the use of deadly force;
>
> (b) The inadequacy of SAPD's policies, training, supervision, or discipline relating to the use of non-lethal control devices and tactics which if mandated to be used by all SAPD Officers would have prevented the violation of

WESTALL'S constitutional rights;

(c) The adoption of a completely subjective use of force policy that allows the use of deadly force to the unchecked discretion of officers on the scene;

(d) The adoption of a policy that allows officers to use the degree of force that the officer feels brings the situation quickly under control as per his or her individual judgment even if that method is deadly force;

(e) Lack of any training to properly respond to persons experiencing a mental health crisis including but not limited to all proper de-escalation techniques;

(f) Using excessive and/or deadly force against WESTALL although she posed no immediate threat of harm to Sgt. Perry or to other persons; and

(g) Employing an unwritten policy and practice of making false statements about constitutional violations of SAPD officers while at the same time concealing the evidence of the violations.

## **DAMAGES**

41.     The Plaintiffs incorporate by reference all of the above paragraphs of this Complaint as though fully set forth herein. The acts and omissions of the CITY OF SAN ANTONIO were a proximate cause and/or the moving force behind the following damages suffered by the Plaintiffs and for which the Defendants are jointly and severally liable:

42.     The Estate of HANNAH QUINN WESTALL (Survival Claim) is entitled to recover damages for the pain and mental anguish suffered by WESTALL prior to her death. The Estate is also entitled to recover WESTALL'S funeral and burial expenses, loss of value of life, and exemplary damages.

43.     MARLO ONDREJ as the mother of HANNAH QUINN WESTALL and a wrongful death beneficiary is entitled to and shall recover mental anguish damages (past, present, and future) for the emotional pain, torment, and suffering she has experienced and will continue to experience because of the death of her daughter. ONDREJ is also entitled to and shall recover damages for the loss of companionship and society (past, present, and future) in the form of the

loss of positive benefits that flow from the love, comfort, companionship, and society that MARLO ONDREJ would have received from her daughter had she lived.

44.     J.B.M. as the daughter of HANNAH QUINN WESTALL and a wrongful death beneficiary is entitled to and shall recover mental anguish damages (past, present, and future) for the emotional pain, torment, and suffering she has experienced and will continue to experience because of her mother. J.B.M. is also entitled to and shall recover damages for the loss of companionship and society (past, present, and future) in the form of the loss of positive benefits that flow from the love, comfort, companionship, and society that J.B.M. would have received from her mother had she lived.  Further, J.B.M. is entitled to damages for the loss of care, maintenance, support and services, advice, counsel, and reasonable contributions of pecuniary value (past, present, and future) that J.B.M. would have received from her mother had she lived. J.B.M is also entitled to recover for the loss of inheritance in the form of the present value of the assets that her mother would have added to the estate and left or bequeathed to J.B.M. at the time of her natural death.

## **EXEMPLARY DAMAGES**

45.     The Plaintiffs incorporate by reference the above paragraphs of this Complaint as though fully stated herein.

46.     The Defendants acted with and/or were motivated by evil motive or intent when they violated the constitutional rights of WESTALL. At a minimum, the Defendants were reckless and/or callously indifferent to WESTALL'S constitutional rights. Accordingly, the Plaintiffs request punitive and exemplary damages to deter any future failure to train and supervise officers to avoid shooting innocent persons multiple times.

## ATTORNEY'S FEES

47.     The Plaintiffs re-allege all of the facts alleged in the preceding paragraphs as if they were fully set forth herein. Based on said facts and pursuant to 42 U.S.C. § 1988, the Plaintiffs are seeking the recovery of all the reasonable attorney's fees incurred through trial as well as for reasonable attorney's fees that may be incurred for any post-trial proceedings, or appeal, interlocutory or otherwise.

## CONDITIONS PRECEDENT

48.     The Plaintiffs reserve the right to plead and prove the damages to which they are entitled to at the time of trial. All conditions to the Plaintiffs' recovery shall be performed and/or have been performed.

## JURY DEMAND

49.     The Plaintiffs have paid the jury fee and demand a trial by jury.

## PRAYER FOR RELIEF

Wherefore, Plaintiffs respectfully pray for the following relief:

1)      Any and All Actual Damages

2)      Reasonable and Necessary Attorney's fees as provided by law;

3)      Exemplary Damages;

4)      Pre-Judgment and Post-Judgment as provided by law;

5)      Costs of Court; and

And for all other and further relief to which the Plaintiffs may show themselves to be justly entitled.

Respectfully Submitted,

THE CORTEZ LAW FIRM
1202 South Alamo Street
San Antonio, Texas 78210
Telephone No.:  (210) 273-2277
Facsimile  No.:  (210) 504-1523
adam@cortezlawfirm.com

By:      **/s/ Adam C. Cortez**
         ADAM C. CORTEZ
         Attorney in Charge
         State Bar No.: 04844650

ATTORNEYS FOR PLAINTIFFS